IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY HARRINGTON,<br><br>        Plaintiff,<br><br>    v.<br><br>MATTEL, INC. *et al.*,<br><br>        Defendant.<br>_____/ | No. C07-05110 MJJ<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO REMAND** |

**INTRODUCTION**

Before the Court is Plaintiff Ann Harrington's ("Plaintiff") Motion to Remand ("Motion") this action back to San Francisco Superior Court. (Docket No. 5.) Defendants Mattel, Inc. and Fisher-Price Inc. (collectively, "Defendants") oppose the Motion. For the following reasons, the Court **DENIES** Plaintiff's Motion to Remand.

**FACTUAL BACKGROUND**

This case arises from Defendants' toy recalls announced during the summer and early fall of 2007. This action is one of eighteen putative class actions currently pending in federal district courts, which were all filed after the recall. Defendant Mattel, Inc., a Delaware corporation, is headquartered in El Segundo, California. Defendant Fisher-Price Inc., also a Delaware corporation, is headquartered in East Aurora, New York. Fisher-Price Inc. is a wholly-owned subsidiary of Mattel, Inc.

The material allegations of Plaintiff's Complaint are as follows.

Plaintiff, a San Francisco resident and mother of two children, purchased a Fisher-Price Dora Talking Pony Palace for her four-year-old daughter. On August 2, 2007, the United States Consumer Product Safety Commission ("CPSC") announced a voluntary recall of Fisher-Price and Mattel branded toys. The toys listed on this press release were sold for $5 to $40. Defendants did not offer to reimburse Plaintiff or other members of Plaintiff's putative class ("Class") for the purchase cost of the recalled toys, although Defendants did offer vouchers for future Fisher-Price products, available to purchasers of these defective toys. Defendants also have recommended that children exposed to the lead-paint-tainted toys to be taken in for lead-testing. As such, Plaintiff brought this class action to recover actual and compensatory damages as well as the costs of diagnostic testing for herself and the Class.

On August 20, 2007, Plaintiff filed a lawsuit in the San Francisco Superior Court against Defendants for breach of the implied warranty of merchantability and violation of California's Unfair Competition Law, California Business and Professions Code § 17200.[1] Plaintiff brought a class action against Defendants on behalf of herself and others similarly situated, seeking restitution, damages, punitive damages, and declaratory and injunctive relief allegedly related to the marketing, distribution, and sale of toys that Defendants recalled. (*See* Compl. ¶¶ 41- 59.) Plaintiff seeks to represent a putative class consisting of "[a]ll persons, sole proprietorships, partnerships, corporations and other entities in the State of California who purchased toys from any of the Defendants or their subsidiaries at any time during the period from January 1, 2003 to the present (the 'Class Period')." (Compl. ¶ 34.) Plaintiff specifically alleges that the "toys" include all of the toys that were subject to the August 2, 2007 recall. (*See* Compl. ¶ 4.) Additionally, Plaintiff alleges that "Defendants distributed approximately one million of the toys containing lead paint." (Compl. ¶ 25.)

In addition to damages reflecting the costs of the defective toys, Plaintiff also asks that Defendants be held liable for future costs of medical monitoring as well as punitive damages. (*See* Compl. ¶ 53-54.) Plaintiff also claims that the "total amount in controversy as to Plaintiff and

---

[1] The state court case is captioned *Harrington v. Mattel, Inc. et al.*, CGC-07-466356. Plaintiff served Defendants with the complaint and summons on September 11, 2007. The matter was designated as complex and assigned to the Complex Litigation Department of Judge John E. Munter on September 27, 2007.

2

at least one individual Class member alleged herein does not exceed seventy-five thousand dollars ($75,000.00), including interests and costs." (Compl. ¶ 3.)

On October 4, 2007, Defendants timely removed this case pursuant to the Class Action Fairness Act ("CAFA") codified in relevant part at 28 U.S.C. §§ 1332(d) and 1453.

On November 5, 2007, Plaintiff filed this Motion, which requests that the Court remand this action back to San Francisco Superior Court and that attorney fees be granted in the event of remand. This Motion is based on two grounds: (1) Plaintiff contends Defendants have not proved by a preponderance of evidence that the amount in controversy exceeds the $5 million CAFA jurisdictional threshold; and (2) Plaintiff contends that the case is subject to remand based upon the home-state controversy exception of 28 U.S.C. § 1332(d)(4)(B).

## LEGAL STANDARD

### I.  CAFA Amount in Controversy Standard

Pursuant to 28 U.S.C. § 1441(a), a defendant in a civil action may remove a case from state court to federal district court if the district court has subject matter jurisdiction over the case. Pursuant to CAFA, district courts have jurisdiction over class actions in which the amount in controversy exceeds $5 million in the aggregate and any one member of the putative class is diverse from any defendant. 28 U.S.C. § 1332(d)(2).

Pursuant to 28 U.S.C. § 1447(c), a plaintiff may challenge the propriety of removal based on procedural defects and move to remand a case to state court within 30 days after the filing of the notice of removal. *See N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 2003). Because the Court strictly construes the removal statute against removal, if there is any doubt as to the existence of federal jurisdiction, the Court should remand the matter to state court. *See Gaus v. Miles*, *Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). This burden generally remains the same under CAFA. *See Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 685 (9th Cir. 2006).

The district court must first consider whether it is "facially apparent" from the complaint that the jurisdictional amount in controversy requirement is met. *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997). When the complaint is not clear, "the removing party must

3

prove, by a preponderance of the evidence, that the amount in controversy meets the jurisdictional threshold." *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003). Establishing the amount in controversy requires more than a "mere averment" that the requisite amount is at stake. *Gaus*, 980 F.2d at 567. Rather, defendants are expected to put forth "summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (internal citations omitted).

**II.    "Home-State" Controversy Exception to CAFA**

The "Home-State" Controversy Exception to CAFA, codified in 28 U.S.C. § 1332(d)(4)(B), states in relevant part:

> A district court shall decline to exercise jurisdiction . . . [where] (B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

28 U.S.C. § 1332(d)(4)(B). The party seeking remand bears the burden of proof as to the exceptions under CAFA. *See Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1019 (9th Cir. 2007).

**ANALYSIS**

**I.    Defendants Have Sufficiently Demonstrated That The CAFA Amount in Controversy Standard Has Been Met.**

Because it is not clear from the face of the complaint if the jurisdictional amount in controversy is met, Defendants have the burden to prove, by a preponderance of the evidence, that the amount exceeds $5 million. *See Matheson*, 319 F.3d at 1090. Defendants need only "produce underlying facts showing only that it is *more likely than not* that the amount in controversy exceeds $5,000,000.00, assuming the truth of the allegations plead [sic] in the Complaint." *Muniz v. Pilot Travel Centers LLC*, 2007 WL 1302504, at *2 (E.D. Cal. May 01, 2007) (emphasis in original). For the reasons elucidated below, the Court finds that the Defendants have met this burden.

**A.    Plaintiff's Calculation Of The Amount In Controversy.**

Plaintiff calculates a total possible $2,755,000 in relief assuming the best case scenario for the Class. According to Plaintiff, economic damages would consist of two costs: (1) cost of the defective toys to Plaintiffs and (2) medical monitoring costs for lead poisoning tests. Plaintiff asks

4

1  the court to assign a $25 value to each of the 29,000 products at issue.[2]  According to Plaintiff, the
2  Class could get $725,000 in restitution under § 17200 for the cost of the defective toys ($25 * 29,000
3  = $725,000).  Plaintiffs could also get another $725,000 for the cost of the defective toys as an
4  independent measure of damages under California Commercial Code § 2714 for warranty claims.
5  Plaintiff further asserts that medical monitoring will cost approximately $45 per child.  Plaintiff
6  argues that, even assuming 29,000 affected consumers, the aggregated cost for medical monitoring
7  in California would be closer to $1,305,000 (29,000 * $45 = $1,305,000).  Plaintiff bases her $45
8  estimate for medical monitoring costs on a 2002 study commissioned by the District Board of Health
9  of Mahoning County, Ohio that quantified some of the direct costs to taxpayers to screen and treat
10 children for lead poisoning.  (Motion at 5:1-8; Ramos Decl., Exh. D.)  In sum, Plaintiff estimates
11 that economic damages would not be more than $2,755,000.[3]

**B.     Defendants' Calculation of the Amount in Controversy.**

Defendants, on the other hand, allege that the total aggregate amount in controversy exceeds $5 million.  In particular, Defendants take issue with the medical monitoring costs and estimate that medical monitoring costs are more than $200 per person, which would make the total amount of controversy to be excess of $5 million, assuming that 29,000 consumers required testing (29,000 * $200 = $5,800,000).  Assuming Plaintiffs could collect $725,000 in restitution and another $725,000 in damages related to warranty claims, the amount in controversy would exceed $7 million.

Defendants estimate that the cost of a single blood lead level test ("BLL test") is more than $60 based on inquiries to six blood testing facilities in California.  (*See* Meyers Decl., ¶ 4.) Defendants also allege that the relief sought by Plaintiff would constitute at least two BLL tests and a single clinical evaluation, which would exceed $200 in Defendants' estimation.  Defendants

---

[2] Defendants approximate that out of the one million toys Plaintiff puts at issue, 29,900 were in the hands of consumers in California.  (*See* Def.'s Notice of Removal, Exhibit 2, Declaration of Scott Penny.)  In their own calculations, which Plaintiffs characterize as a "reasonable" approximation, Plaintiffs round that figure down to the nearest thousand and assume 29,000 consumers affected by the recall.  In their reply, Plaintiffs newly attack the 29,900 figure as "speculation", primarily because of Defendants' assumption that 50% of the toys sold by retailers in California were subject to recall. Plaintiffs, however, fail to introduce any evidence that would contradict this assumption, and the Court finds it to be reasonable in light of the information available to Defendants.

[3] Though Plaintiff does not include attorney's fees in her estimate of the amount in controversy, Plaintiff concedes that $344,000 would be a reasonable measure for attorney's fees in this case based on Plaintiff's estimate of economic damages.  (Motion at 6:23-24.)

5

submit a report by the Center for Disease Control ("CDC Report") that recommends conducting at least two different BLL tests because lead exposures may change with a child's developmental progress. (Rector Decl., Exh. 1.)

### C. Defendants Have Demonstrated That The Amount In Controversy More Likely Than Not Exceeds $5 Million.

The Court finds Defendants have sufficiently produced underlying facts showing that it is more likely than not that the amount in controversy exceeds $5,000,000, assuming the truth of the allegations plead in the Complaint. *See Muniz*, 2007 WL 1302504, at *2. It is clear from the face of the Complaint that Plaintiff seeks, in addition to the cost of the defective toys, the cost of medical monitoring.[4] Based on the record submitted by the parties, Plaintiff's estimate that medical monitoring would cost only $45 per child appears to the Court to be an excessively low figure. The 2002 study on which Plaintiff relies (Ramos Decl., Exh. D) itself acknowledges that many of the children discussed in the study "may have had medical costs related to their lead exposure" not included in the study. Moreover, CDC recommendations suggest that more than one BLL test per child, and possibly a clinical evaluation, would be within the scope of the relief sought in Plaintiff's complaint. The Court also finds that Defendants' evidence establishes that the cost of a single BLL test in California would more likely than not cost approximately $60. While Defendants' estimate of $200 in medical monitoring costs per child may be too high, the Court finds that the record supports the conclusion that the anticipated cost per child is at least $120 (the cost of two BLL tests). This puts the amount at controversy at $5,382,000, including $3,588,000 in medical monitoring costs (29,900 * $120), $1,450,000 in restitution and warranty economic relief, and $344,000 in attorney fees.[5]

---

[4] Plaintiff's Complaint does not make allegations that otherwise cabin the range or scope of damages and other relief she seeks. "Plaintiff is the master of her claims, and if she wanted to avoid removal she could have alleged facts specific to her claims which would narrow the scope of the putative class or the damages sought." *Muniz*, 2007 WL 1302504, at *4 (quotation and citation omitted). Plaintiff has not done so here.

[5] In addition to economic relief, Plaintiff requests a "declaration that Defendants have engaged in unlawful, unfair, and deceptive business practices." Defendants argue that they would incur costs as a result of such relief that should be considered part of the amount in controversy, including costs resulting from the need to cease and desist from conduct addressed by declaratory relief. Because Defendants have adequately demonstrated that the amount in controversy exceeds the $5 million CAFA jurisdictional standard, the Court need not reach this argument.

## II. The "Home-State" Controversy Exception to CAFA Does Not Apply.

The "Home-State" Controversy Exception to CAFA states in relevant part:

> A district court shall decline to exercise jurisdiction . . . [where] (B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

28 U.S.C. § 1332(d)(4)(B). Plaintiff bears the burden of showing that this exception applies. *See Serrano*, 478 F.3d at 1024 ("The well-established rule that the party seeking remand must prove the applicability of such exception governs with equal force in the context of CAFA as with the general removal statute.")

The home-state exception requires all primary defendants to be citizens of the State in which the action is filed. Plaintiff argues that Mattel, Inc., headquartered in California, is the sole primary defendant in the case and therefore, the home-state exception applies. Defendants, on the hand, argue that both Mattel, Inc. and Fisher-Price Inc. are primary defendants. Because Fisher-Price Inc. is a citizen of Delaware (state of incorporation) and New York (headquarters), Defendants argue that the home-state exception does not apply because both primary defendants are not citizens of California.

The term "primary defendants" is not defined within CAFA. *See Kearns v. Ford Motor Co.*, 2005 U.S. Dist. LEXIS 41614 (C.D. Cal. Nov. 21, 2005). The Report of the Senate Judiciary Committee explained that the term "primary defendants" should be:

> interpreted to reach those defendants who are the real "targets" of the lawsuit - i.e., the defendants that would be expected to incur most of the loss if liability is found. Thus, the term "primary defendants" should include any persons who has substantial exposure to significant portions of the proposed class in the action, particularly any defendant that is allegedly liable to the vast majority of the members of the proposed classes (as opposed to simply a few individual class members).

S. Rep. No. 109-14, at 43, as reprinted in 2005 U.S.C.C.A.N. 3, 41.

Plaintiff argues that because she seeks significant relief from Mattel, Inc., and because Mattel, Inc.'s conduct forms a significant basis of the claims, Fisher-Price Inc. should not be regarded as a primary defendant. Plaintiff points to Scott Penny's Affidavit, stating that Mattel, Inc. directs the Sales, Marketing, and Finance Groups and senior management of its subsidiaries, including Fisher-Price Inc., as proof that even Mattel, Inc. believes that its conduct, and not any

7

1  independent action on part of its wholly owned subsidiary, Fisher-Price. Inc. forms the primary basis
2  for these claims. (Plf.'s Mot. to Remand at 8:12-16.) Furthermore, Plaintiff argues that Fisher-Price
3  Inc. should not be considered a primary defendant because Mattel, Inc. consolidated its domestic
4  Mattel Girls & Boys Brands and Fisher-Price Brands divisions into one division, which resulted in
5  the consolidation of some management and support functions. ( Ramos Decl., Exh. E.)

6  Defendants, however, argue that Plaintiff did not meet her burden to prove that the home-
7  state exception applies simply by demonstrating that Fisher-Price Inc. is a wholly-owned subsidiary
8  with some consolidated functions. The Court agrees. Parent corporations and their subsidiaries are
9  generally treated as separate legal entities with separate liabilities and assets. *See Scottsdale Ins. Co.*
10 *V. Homestead Land Dev. Corp.*, 1992 U.S. Dist. LEXIS 21915, at *17 n.8 (N.D. Cal. Oct. 20, 1992)
11 ("courts consistently honor the separation between a parent corporation and its subsidiary, and have
12 treated such corporations as separate legal entities with separate liabilities and assets."); *Miller v.*
13 *IBM*, 2006 U.S. Dist LEXIS 73715 (N.D. Cal. Sept. 26, 2006) (granting defendant's motion for
14 summary judgment in part because plaintiff failed to present basis for holding parent corporation
15 liable for its subsidiaries' conduct). Although the parent company here, Mattel, Inc., may have some
16 say in the direction of product development at Fisher-Price Inc., this does not change the fact that
17 Plaintiff has separately named Fisher-Price Inc. as a defendant, who along with Mattel, Inc. is
18 "allegedly liable to the vast majority of the members of the proposed classes (as opposed to simply a
19 few individual class members)." S. Rep. No. 109-14, at 43. Plaintiff certainly has made the case
20 that Mattel, Inc. should be considered a primary defendant. On this record, however, Fisher-Price
21 Inc. is also a primary defendant. Plaintiff has not met her burden to establish that the home-state
22 controversy exception should apply.
23 //
24 //
25 //
26 //
27 //
28 //

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion to Remand and Motion for Attorneys' Fees.

**IT IS SO ORDERED.**

Dated: December 20, 2007

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE